UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION

CASE NO. 10-10110-CIV-KING/MCALILEY

JENNIFER A. STEPHENS, as Personal
Representative of the Estate of Charles
Eugene Becker and as Assignee of
Anchorage Homes LLC,

        Plaintiff,

v.

MID-CONTINENT CASUALTY
COMPANY,

        Defendant.

_____/

## ORDER GRANTING SUMMARY JUDGMENT

**THIS MATTER** comes before the Court upon Plaintiff's Motion for Partial Summary

Judgment (DE #99), filed May 11, 2012, and Defendant's Motion for Summary Judgment (DE

#101), also filed May 11, 2012. Therein, Plaintiff Jennifer A. Stephens, as personal representative

of the Estate of Charles Eugene Becker and as Assignee of Anchorage Homes LLC, ("Plaintiff" or

"Stephens"), seeks judgment as a matter of law on the issues of wrongful refusal to defend and

coverage, and Defendant Mid-Continent Casualty Company ("Defendant" or "Mid-Continent")

seeks summary judgment on all issues. The Court is fully briefed on both Motions and proceeds

with the benefit of oral argument.[1] The Court grants summary judgment for the Defendant Mid-

---

[1] Defendant filed its Response to Plaintiff's Motion on June 14, 2012 (DE #130) and Plaintiff filed her Reply on June 25, 2012 (DE #150). Plaintiff filed her Response to Defendant's Motion on June 14, 2012 (DE #129) and Defendant filed its reply on June 25, 2012 (DE #152). Parties also filed and briefed Statements of Undisputed Material Facts (*see* Plaintiff's Notice of Deposition Transcripts (DE #100), Defendant's Notice of Undisputed Facts (DE #102), Defendant's Notice of "Evidence in Support" (DE #107), Plaintiff's Response to Defendant's Statement of Undisputed Material Facts (DE #128), Defendant's Response to Plaintiff's Statement of Material Facts (DE #131), Defendant's Notice of Filing Evidence (DE #132), Defendant's Response to Plaintiff's Material Facts (DE #139), Plaintiff's Reply to Defendant's Response to Plaintiff's Statement of Facts (DE #149), and Defendant's Reply to Plaintiff's Response to Defendant's Statement of Facts (DE #153). Finally, the Court heard oral argument on November 1, 2012. [DE #192].

Continent Casualty Company.

I.      **Background**

Plaintiff Stephens, as personal representative of the Estate of Charles Eugene Becker and as Assignee of Anchorage Homes, LLC, filed the instant action on December 8, 2010, alleging breach of contract against Defendant Mid-Continent Casualty Company.  Defendant submitted a Motion to Dismiss (DE #7) on January 25, 2011 and, upon the Court's Order Denying the Motion to Dismiss (DE #59, filed December 1, 2011), submitted its Answer and Affirmative Defenses on December 13, 2011 (DE #62).  Parties spent the next ten months in discovery and motion practice.  On November 1, 2012, the Court heard oral argument from parties on the cross-motions for summary judgment.  All discovery has been completed, and oral argument from each party on the issues contained in those motions has been held, it is therefore appropriate for the Court to rule on summary judgment.  The following facts are uncontested.  (*See* Joint Pretrial Stip. 5-6, DE #182).

Jeffrey and Connie Kirkland wanted to have a modular home built on their property at 28572 Buccaneer Road, Little Torch Key, in Monroe County, Florida.  On June 22, 2004, they applied for a county building permit.  The County granted a permit on March 14, 2007, and on August 13, 2007, the Kirklands signed an Owner/Contractor Agreement with Anchorage Homes, LLC ("Anchorage").  The Kirklands paid Anchorage the deposit and all of the draws and progress payments included in the Owner/Contractor Agreement, and Anchorage in turn paid the subcontractors that worked on the project from the draws and progress payments. Jack Fritz[2] was hired to set the modular home on the foundation, which he did with the help of a set crew.  One of

_____

[2] Although the Amended Complaint filed by Plaintiff in Circuit Court lists Jack Fritz, Dax Fritz, and Team Fritz, Inc. as separate defendants, parties use the singular name "Jack Fritz" when describing the background of the incident in the joint pretrial stipulation (DE #182).  Therefore, and for the purpose of general simplicity in this order, the Court will treat Jack Fritz, Dax Fritz, and Team Fritz, Inc. as the same entity and refer to them jointly as "Jack Fritz."

the people Fritz hired and paid, Charles Eugene Becker, died on June 7, 2008 after falling off a ladder during the course and scope of his work for Fritz on the Kirklands' modular home project. At the time of Becker's passing, Anchorage Homes held an insurance policy with Defendant Mid-Continent (Policy GL 711655, effective dates April 7, 2008 through April 7, 2009).  Plaintiff Stephens filed a wrongful death suit on November 25, 2008, against Anchorage Homes, Team Fritz, Inc., and the Kirklands, as personal representative of the decedent's estate.[3]  Anchorage Homes provided the Complaint to its insurance agent on December 15, 2008, who in turn submitted the Complaint to Mid-Continent on December 17, 2008.  (Joint Pretrial Stip. 5-6, DE #182).  In addition, the Court finds the following facts.

The aforementioned signed Owner/Contractor Agreement is printed on Anchorage Homes letterhead which includes, printed at the top of the page, the words "ANCHORAGE HOMES, LLC" and "General Contractor CGC1504438" above Anchorage Homes' mailing address and contact numbers.  (DE #47-2 at 88).  The agreement, between the Kirklands and Anchorage Homes, named Anchorage Homes as "the Contractor," and the Kirklands as "the Owner."  (Owner/Contractor Agreement, DE #47-2).  The Agreement states that "Contractor is not responsible for time of completion for work being done by Owner or his agents," (*id.*) delineating the Owner's *agents* from the Owner's named *Contractor*, Anchorage Homes.  It also includes a progress payment to be made to Anchorage for "Delivery and set of system built home."  *Id.*  The Agreement further states the following, under Section VIII., "General Provisions":

2.      Contractor may at its discretion engage subcontractors to perform work hereunder. Contractor shall in all instances remain responsible for the proper completion of the contract.  The Contractor shall supervise and direct all the work.

---

[3] As Defendant helpfully stated in its Brief on Coverage (DE #47-1 at 15, n.13), "an Amended Complaint was later filed in the underlying action. The Amended Complaint added Jack Fritz and Dax Fritz as defendants. The only new allegations were alternative claims that Team Fritz, Jack Fritz and/or Dax Fritz was the construction company hired to install the modular home; and, that Plaintiff's decedent was employed by Team Fritz, Jack Fritz and/or Dax Fritz."

3.      Contractor shall provide and pay for all labor, materials, equipment, tools, transportation, and other facilities and services necessary for the proper execution and completion of the work.

…

16.      Owner agrees he shall not directly contact any subcontractors, including but not limited to, home manufacturer or suppliers hired by Contractor without the written consent of Contractor.

By execution of this agreement, I agree to have read and fully understand all of statements and implications of this document.  I agree to abide by and follow the above conditions as listed in this agreement. (*Id.*)


At least three versions of the aforementioned Monroe County permit (#04102997) showing identical dates and permit numbers but differing amounts of money under the Schedule of Fees have been filed on the record by parties in this case.[4]  (*See* DE #22-2 at 6 (filed May 20, 2011), DE #44-3 at 19 (filed August 24, 2011), and DE #99-1 at 2 (filed May 11, 2012).  One version appears to have been signed by Mr. Kirkland, and states that no subcontractors have been assigned (DE #99-1 at 2-4), whereas the other two versions appear to be signed by Anchorage Homes principle William Liptak (DE #44-3 at 19 and DE #22-2 at 6).  Furthermore, the third version (DE #22-2 at 6) includes a handwritten note that appears to state "Paid co fee and added sub-contractors."  (DE #22-2 at 6).

The Monroe County 180-Day Extension Request Form dated January 2, 2008 (DE #47-3 at 101, filed by Defendant) lists Jeffrey Kirkland on the line labeled "Owner Name" and displays Liptak's signature on the line labeled "Owner/Contractor."  Defendant also filed a site plan submitted to the State of Florida Department of Health as part of an application for onsite sewage

---

[4] Plaintiff Stephens filed two herself, and relies on the third (filed by Defendant Mid-Continent) in her Opposition to Defendant's Motion for Final Summary Judgment.  (*See* DE #129 at 5-6).

disposal system construction permit that appears to have been signed by Liptak with the letters "GC" written on the line designated for "Title." (DE #47-3 at 103). A conflicting document titled "Notice of Commencement," dated March 14, 2007 and sworn by Jeffrey Kirkland before a notary, states only the word "Owner" in the area designated for "Contractor's Information." (DE #99-1 at 62).

Regarding the relationship between Jack Fritz and Anchorage, Fritz testified in his deposition that he never entered a contract with Anchorage Homes. (Fritz Dep. 127:8-10, DE #100-3). The evidence conflicts as to who hired Fritz.[5] However, it was Anchorage that paid the subcontractors from the draws/progress payments delineated in the Owner/Contractor Agreement between Anchorage and the Kirklands (Joint Pretrial Stip. 5, DE #182). Fritz also submitted his estimates for the work he was to perform to Anchorage. On May 28, 2007, Fritz submitted several work estimates to Anchorage, each of which prominently stated the following: "Bill to: / William Liptak / Anchorage Homes / 88101 Overseas Highway / Islamorada,, FL 33036" and "Ship to: / Jeff-Connie Kiekland / Anchorage Homes / Lot 2 Block 8 Jolly Rodger Estates / Jeff cell 727 418 4738 / Little Torch,, FL" [sic]. (*See* DE #47-4 at 25– 31).

As noted above, at the time of Becker's death, Anchorage Homes held a Commercial General Liability Policy with Mid-Continent with a policy period of April 7, 2008 to April 7, 2009. (Ins. Policy, DE #1-1). The policy, which is dated February 11, 2008, lists Anchorage's business description as "General Contractor" and includes a list of exclusions to bodily injury and property damage coverage. *Id.* at 1, 14-18. The policy notes that the company "will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply." *Id.* at 14. The exclusion section reads, in part:

---

[5] While the Kirklands both stated in affidavits for the wrongful death suit that they "did not hire subcontractors TEAM FRITZ, INC," (DE #47-2 at 104-109), Liptak testified in his deposition that it was the Kirklands who hired Fritz. Liptak Dep. 32:3-5 (DE #100-2 at 7).

**2.      Exclusions**

This insurance does not apply to:

…

d.      **Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or

unemployment compensation law or any similar law.

e.      **Employer's Liability**

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

a.   Employment by the insured; or

b.   Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of

Paragraph (1) above.

This exclusion applies whether the insured may be liable as an employer or in any other

capacity and to any obligation to share damages with or repay someone else who must pay

damages because of the injury.

This exclusion does not apply to liability as assumed by the insured under an "insured

contract". *Id.* at 14-15.


The definitions section of the policy defines "bodily injury" as "bodily injury, sickness or disease

sustained by a person, including death resulting from any of these at any time," and states that

"'[e]mployee' includes a 'leased worker'.  'Employee' does not include a 'temporary worker'."[6] *Id.*

---

[6] The policy further defines "leased worker" as "a person leased to you by a labor leasing firm under an agreement
between you and the labor leasing firm, to perform duties related to the conduct of your business.  'Leased worker' does

at 76.

In a letter dated June 19, 2008 and addressed to Linda Liptak as Registered Agent of Anchorage Homes, an attorney for the Estate of Charles Becker requested insurance information related to the death of Charles Becker. (*See* DE #99-1 at 15-16). In July of 2008, Anchorage Homes contacted its insurance carrier, Mid-Continent, apparently via Regan Insurance Agency, Inc., informing Mid-Continent of the demand. *See id.* at 11-16.[7]

On September 24, 2008, Mid-Continent responded via certified mail to William Liptak as President of Anchorage Builders, Inc. and Anchorage Homes, LLC, acknowledging notice of the claim and indicating that the insurance policy "may not provide coverage" but requesting that Anchorage Homes forward to Mid-Continent "any information, evidence, documents, or authority" for consideration. (DE #99-1 at 18-23).

As noted above, the parties jointly stipulate that Jennifer Stephens filed the underlying complaint (DE #99-1 at 29-58) dated November 25, 2008 in the Circuit Court of Monroe County against Team Fritz, Jeffrey Kirkland, Connie Kirkland, and Anchorage Homes, LLC. (*See* Joint Pretrial Stip. 5-6, DE #182). The underlying complaint (as amended) (Stephens Am. Compl. DE #47-2 at 36-78) included the following allegations:

14.     At all times material, Defendant JACK FRITZ owned, managed, and/or operated a construction company that was hired to *install a modular home* at the subject premises...

        ...

---

not include a 'temporary worker';" and "temporary worker" as "a person who is furnished to you to substitute for a permanent 'employee' on leave or to meet seasonal or short-term workload conditions." (DE #1-1 at 77-78).
[7] In addition to the letter from Brenda Monroe to Mid-Continent informing Mid-Continent of the demand, Plaintiff has filed a copy of a document purporting to be "Mid-Continent Claim Notes, July 17, 2008" (DE #99-1 at 9). Counsel on both sides have submitted several such "claim notes" purporting to record details of conversations held by various people with representatives of Mid-Continent. The Court considers the host of claim notes in the record to be generally inconclusive and in some cases, difficult to read. Plaintiff argues in its Opposition to Defendant's Motion for Final Summary Judgment (DE #129) that the Court should not be persuaded of the veracity of those claim notes relied on by Defendant, and simultaneously asks the Court to be persuaded by other claim notes by Mid-Continent employees purporting to record notes from conversations which took place less than a week earlier. Parties cannot have it both ways; the Court therefore will disregard the Mid-Continent claim notes filed in the record.

20.     At all times material, Defendant ANCHORAGE HOMES, LLC, owned, managed, and/or operated a construction company that was hired to supply and *install a modular home* at the subject premises…

…

26.     At the time of the incident, CHARLES EUGENE BECKER was working for TEAM FRITZ, INC., DAX FRITZ and JACK FRITZ on an improperly and/or inadequately secured ladder attached to the side of the modular home, supplied by and installed by ANCHORAGE HOMES, LLC …

…

67.     Defendant JACK FRITZ knew and/or should have recognized the likelihood of an *employee* being injured or killed by the improperly and/or inadequately secured ladder.

…

83.     Defendant JEFFREY KIRKLAND, as owner of the subject property and contractor of record, knew and/or should have recognized the likelihood of a *worker* being injured or killed by the improperly and/or inadequately secured ladder.

…

99.     Defendant CONNIE KIRKLAND, as owner of the subject property and contractor of record, knew and/or should have recognized the likelihood of a *worker* being injured or killed by the improperly and/or inadequately secured ladder.

…

115.     Defendant ANCHORAGE HOMES, LLC, knew and/or should have recognized the likelihood of an *employee* being injured or killed by the improperly and/or inadequately secured ladder.  Stephens Am. Compl. (DE #47-2 pp. 36-78) (emphasis added).

The Court finds that once service was perfected upon Anchorage Homes, Anchorage

forwarded information on the case to Mid-Continent via Regan Insurance Agency indicating an

assumption that the insurance company(s) would respond to the complaint directly.  (*See* letter

dated Dec. 15, 2008 from Franklin D. Greenman to Bob Regan contained in facsimile sent from

Susan Parker for Brenda Monroe of Regan Insurance Agency to Mid-Continent on Dec. 17, 2008,

DE #99-1 at 26).

Plaintiff's counsel eventually sent a second demand letter, this time to both Anchorage

Homes' counsel and Mid-Continent, dated February 27, 2009.  (DE #47-4 at 95-101).  This letter

included the following statements by Plaintiff's counsel:

> *Anchorage Homes, LLC hired an unlicensed subcontractor – Team Fritz –* to set the
> modular home involved in this incident.  Team Fritz did not have worker's compensation
> insurance and did not even have a Certificate of Competency violating Section 6-25 of the
> Monroe County Code.  The job site where this incident occurred was cited for this violation
> just two days before this tragic incident.  They were ordered to stop working.  Yet despite
> that order from the Building Department, *Anchorage Homes, LLC continued to put its*
> *unlicensed and uninsured subcontractor and its employees to work* in violation of local law.
> . . . *As the general contractor on this job site*, the responsibility for ensuring that the ladder
> was properly secured falls to Anchorage Homes.
> Furthermore, this will be a common law claim without benefit or protection from any of the
> worker's compensation laws.  (Letter from Thomas Scolaro, Counsel for Plaintiff, to Henry
> Ching, Mid-Continent Group, and Frank Greenman, Counsel for Anchorage Homes, dated
> Feb. 27, 2009. DE #47-4 at 95-101) (emphasis added).

In a letter dated April 20, 2009, Mid-Continent confirmed its position that Anchorage's policy

"excludes coverage for this matter" and that it would be "Anchorage Homes, LLC's obligation to defend this matter." (*See* DE #22-3 at 2-7).[8]

Stephens settled with Anchorage Homes in mediation for $4,350,000, assigning Anchorage Homes' rights against its insurer Mid-Continent to Stephens as part of the settlement.[9] (DE #15-1 at 7-8). Stephens also eventually settled with Jack Fritz's insurance company, Hastings Mutual Insurance Company, for $75,000, in a notarized agreement dated February 24, 2011 (signed only by Jennifer Stephens, her Counsel Thomas Scolaro, and the notary public). (DE #53-2). The parties disagree whether the payment from Hastings Mutual to Stephens was worker's compensation. (*See* DE #130 at 14.)

There has been much dispute over the mediated settlement agreement between Stephens and Anchorage Homes. The Court finds the facts surrounding the agreement to be as follows.

On August 27, 2010, Plaintiff Stephens and Anchorage Homes took part in a mediation in the aforementioned Circuit Court case that resulted in a settlement agreement signed on August 27, 2010 by Jennifer Stephens, Attorney Thomas Scolaro (Plaintiff's Counsel), William Liptak, and Attorney Franklin Greenman (counsel for Anchorage Homes), as well as a witness and a notary public. (DE #35-1 at 6-14). The Mediation Report filed with the Circuit Court indicates that

> [i]f the mediated agreement is not rescinded by Defendant ANCHORAGE HOMES, LLC, in writing, on or before September 7, 2010 at 5:00p.m., the attached *Settlement Agreement, Assignment of Rights and Covenant Not to Execute* shall be deemed accepted by Plaintiff and Defendant, ANCHORAGE HOMES, LLC. and shall be considered final in all respects. (DE #35-1 at 5) (emphasis in original).

---

[8] In addition to the letter from Mid-Continent confirming its position, Plaintiff has filed a copy of a document purporting to be "Mid-Continent Claim Notes, January 23, 2009" (DE #99-1 at 60) which the Court rules to be difficult to read and generally inconclusive.

[9] There exist two versions of the signed settlement agreement between Jennifer Stephens and Anchorage Homes. (DE #35-1 at 6-14, and DE #15-1 at 1-9). Both versions include a settlement amount of $4,350,000 and the assignment of Anchorage's rights against Mid-Continent to Stephens.

At the bottom of the August 27, 2010 agreement as filed in the record of the case before this Court, appears "DATED this 27 day of August, 2010" followed by the participants' signatures and a notary's signature with the statement "[s]worn to and subscribed before me this 28th day of August, 2010." (DE #35-1 at 13-14). The Court finds that this document was completely signed and dated on either August 27 or August 28 of 2010. Yet in a letter dated September 15, 2010 from Attorney Greenman to Attorney Scolaro, Attorney Greenman wrote that he had enclosed "the original, executed Consent Final Judgment" and instructed Attorney Scolaro to "execute and have [the Plaintiff] execute and submit same to the [Circuit] Court" and to "provide [Attorney Greenman] a copy of the fully executed document." (DE #47-4 at 102). Six days later, in a letter from Attorney Scolaro to Attorney David Fifner (Counsel for the Kirklands) dated September 21, 2010, Attorney Scolaro wrote that Liptak (of Anchorage Homes) "is entering into a Consent Judgment, Settlement Agreement and Covenant Not to Execute with [the Plaintiff]. Once I have the completely signed document back we will be filing suit against Mid-Continent." (DE #47-4 at 103-04). A second version of the settlement agreement purporting to represent the fruits of the August mediation was signed (by the same four participants as before but not the same witness) and dated September 22, 2010, and submitted to the Circuit Court for approval along with a proposed Consent Final Judgment order (DE #47-4 at 105-15). The Court issued the Consent Final Judgment and September 22, 2010 agreement on October 26, 2010. (DE #47-4 at 116-25). Stephens filed the instant action against Mid-Continent in the United States District Court for the Southern District of Florida on December 8, 2010.

On July 27, 2011, six months after Plaintiff Stephens filed her federal case, Stephens and Anchorage made a joint motion to the Circuit Court "to Amend the Consent Final Judgment Against Anchorage Homes, LLC Nunc Pro Tunc Due to a Scrivener's Error." (DE #35-1 at 2-3). The

11

motion, which requested to replace the September 22, 2010 version of the settlement with the August 27, 2010 version as the operative agreement, reads, in part:

> 2.     Due to a scrivener's error, the wrong document was attached as Exhibit A.  The
>        inadvertently attached document contains inaccurate facts and inaccurate allegations
>        and does not represent the final agreement of Plaintiff and Defendant Anchorage
>        Homes.  It was also not notarized.  *Id.* at 3.

The Circuit Court granted the motion on August 2, 2011 (entered August 4, 2011).  (DE #35-1 at 17).  Plaintiff then filed a similar motion to this Court on August 9, 2011 to replace the September 22, 2010 settlement document and with the August 27, 2010 version, appending the Circuit Court motion and order.  (DE #35, 35-1).  This Court granted the motion to replace the second version with the first on August 12, 2010 (DE #38).  The Court mistakenly treated Plaintiff's motion (DE #35) as an unopposed motion, when in fact Plaintiff had indicated in the motion that Defendant opposed the motion.  (DE #35 at 3).  Defendant failed to request reconsideration of the Court's ruling (DE #38) directly, but argued in its Brief on Coverage (filed September 2, 2011) and later filings that Plaintiff is bound by the September 22, 2010 version (DE #47-1 at 20).

A side-by-side comparison of the two documents (the August 27, 2010 agreement and the September 22, 2010 agreement) reveals the following differences (among others):

| Language in August 27, 2010 agreement | Language in September 22, 2010 agreement |
| --- | --- |
| "WHEREAS, Plaintiff has alleged that defendant Anchorage Homes, LLC was acting as Kirkland's *agent* at the time of the death of Charles Becker, and" (DE #35-1 at 6) (emphasis added). | "WHEREAS, Plaintiff has alleged that Defendant Anchorage Homes, LLC, was acting, in place and stead of the KIRKLANDS, as *General Contractor* on the job at the time of the death of Charles Becker, and"  (DE #15-1 at 1) (emphasis added). |
| "WHEREAS, the Plaintiff has asserted that all | "WHEREAS, the Plaintiff has asserted that all |

| | |
|---|---|
| or one or both Defendants, KIRKLANDS or ANCHORAGE HOMES LLC, knew and/or should have recognized the likelihood of a *worker* being injured or killed . . ." (DE #35-1 at 7) (emphasis added). | or one or both Defendants, KIRKLANDS or ANCHORAGE HOMES LLC, knew and /or should have recognized the likelihood of an *employee* being injured or killed . . ." (DE #15-1 at 2) (emphasis added). |
| [Does not appear.] | "and Plaintiff Jennifer A. Stephens, as personal representative of the Estate of Charles Eugene Becker will not look at Anchorage Homes, LLC to satisfy the judgment in the event there is no recovery against Mid-Continent Casualty company [sic], or any related companies, adjusters, assigns, third party claims handlers, insurers or sureties." (DE #15-1 at 6). |

The September 22, 2010 document also appears to have the initials "BL" written in the margin at the end of the third passage referenced in the above chart. (DE #15-1 at 6).


## II.    Legal Standard for Summary Judgment

Summary judgment is appropriate where the pleadings and supporting materials establish that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex*, 477 U.S. at 323–24.

The moving party bears the burden of pointing to the part of the record that shows the absence of a genuine issue of material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). One the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the nonmoving party

to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see also Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991) (holding that the nonmoving party must "come forward with significant, probative evidence demonstrating the existence of a triable issue of fact.").

     "Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the factual interferences that should be drawn from these facts." *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). On a motion for summary judgment, the court must view the evidence and resolve all interferences in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, a mere scintilla of evidence in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment. *See id.* at 252. If the evidence offered by the nonmoving party is merely colorable or is not significantly probative, summary judgment is proper. *See id.* at 249–50.

### III.    Discussion

     Plaintiff Stephens' complaint alleges breach of contract due to Defendant's alleged failure to comply with the contractual duties to defend and to indemnify Anchorage Homes in the underlying suit with Anchorage Homes). Compl. (DE #1). Stephens entered into a so-called *Coblentz* agreement[10] with Anchorage Homes, settling the underlying case and assigning to her the rights of Anchorage Homes against Mid-Continent. As noted by the Third District Court of Appeal of Florida, "[w]here an injured party wishes to recover under a *Coblentz* agreement, 'the injured party must bring an action against the insurer and prove coverage, wrongful refusal to defend, and that the settlement was reasonable and made in good faith.'" *Chomat v. N. Ins. Co. of New York*, 919 So.2d

---

[10] Named for the agreement at issue in *Coblentz v. American Surety Co. of New York*, 416 F.2d 1059 (5th Cir. 1969).

535 at 537 (Fla. Dist. Ct. App. 2006) (internal citation omitted); *see also* In re State Airlines, Inc., 873 F.2d 264, 266 n.2 (11th Cir. 1989). In *Spencer v. Assurance Co. of America*, the Northern District of Florida emphasized that "an insurance company's duty to defend is separate and distinct from its liability to pay under the subject policy," and accordingly addressed the duty to defend prior to duty to indemnify. No. 91-50255-RV, 1993 WL 761408 at *5 (N.D. Fla. 1993). This Court agrees with that approach and will therefore address duty to defend first.

A. **Duty to Defend**

As the Third District Court of Appeal of Florida indicates in *Federal Insurance Co. v. Applestein*, "[i]t is well-settled in Florida that an insurer's duty to defend an action against its putative insured is determined by the allegations of the plaintiff's complaint. No obligation to defend . . . arises when the pleading in question shows . . . the applicability of a policy exclusion." 377 So.2d 229, 231 (Dist. Ct. App. Fla. 1979) (internal citations omitted); *see also Lime Tree Vill. Cmty. Club Ass'n, Inc. v. State Farm Gen. Ins. Co.*, 980 F.2d 1402, 1405 (11th Cir. 1993). "If the allegations of the complaint leave any doubt as to the duty to defend, the question must be resolved in favor of the insured." *Lime Tree*, 980 F.2d at 1405. This general approach has been supplemented in some cases by the consideration of extrinsic evidence in situations in which "uncontroverted evidence places the claim outside of coverage, and the claimant makes no attempt to plead the fact creating coverage or suggest the existence of evidence establishing coverage." *First Specialty Ins. Corp. v. 633 Partners, LTD.*, 300 Fed.Appx. 777, 786-87 (11th Cir. 2008) (citing *Nationwide Mut. Fire Ins. Co. v. Keen*, 658 So.2d 1101 (1995)); *see also Nateman, M.D. v. Hartford Cas. Ins. Co.*, 544 So.2d 1026, 1027 (Dist. Ct. App. Fla. 1989) ("…an obvious exception must be made in those instances where, notwithstanding allegations in the petition to the contrary, the insurer successfully urges the alleged insured is not in fact an insured under the policy"). The

Eleventh Circuit distinguishes *Keen* as "depart[ing] from the general principle" and "best seen as [an] exceptional case[] in which courts have crafted an equitable remedy when it is manifestly obvious to all involved that the actual facts placed the claims outside the scope of coverage." *First Specialty Ins. Corp.* 300 Fed.Appx. 777 at 785. *First Specialty* also factually distinguishes *Keen* from its case at bar because *Keen* involved an omission of a key fact from the allegations contained in the underlying complaint that would have otherwise shown a lack of coverage. *Id.* at 786-87.

In the case at bar, the issue is whether coverage existed as controlled by two particular exclusions contained Anchorage Homes' insurance policy with Mid-Continent: a Worker's Compensation exclusion, and an Employer's Liability exclusion.  It is the Court's finding that Becker's death meets the requirements of the Employer's Liability exclusion provided in the policy because Becker was a "statutory employee" of policy holder Anchorage Homes.  Since the Employer's Liability exclusion applies, the Court finds that no treatment of the Worker's Compensation exclusion is necessary.

### i.  **Employer's Liability**

As noted above, Mid-Continent's policy excludes from coverage "Bodily injury to an 'employee' of the insured arising out of and in the course of . . . [e]mployment by the insured."  Ins. Policy (DE #1-1).  Defendant argues that the decedent was a "statutory employee" of Mid-Continent, and therefore an "employee" under the Bodily injury to an employee exclusion of the policy.  The so-called "statutory employee" is a conceptualization stemming from the language of Section 440.10 of the Florida Workers Compensation Act. *Wellington Specialty Ins. Co. v. Kendall Crane Service*, 434 Fed.Appx. 794 (11th Cir. 2011).  The Act states (in part):

(1)(a)   . . . Any contractor or subcontractor who engages in any public or private construction in the state shall secure and maintain compensation for his or her employees under this chapter as provided in s. 440.38.

(b)   In case a contractor sublets any part or parts of his or her contract work to a subcontractor or subcontractors, all of the employees of such contractor and subcontractor or subcontractors engaged on such contract work shall be deemed to be employed in one and the same business or establishment, and the contractor shall be liable for, and shall secure, the payment of compensation to all such employees, except to employees of a subcontractor who has secured such payment.

As noted by the Third District Court of Appeal of Florida in *Florida Insurance Guaranty Ass'n, Inc. v. Revoredo*, "[t]he Florida Supreme Court . . . made it clear that subcontractors' employees . . . are employees of the contractor and are protected by the workers' compensation law, stating: 'Section 440.10 establishes the concept of 'statutory employer/ for contractors who sublet part of their work to others.'" 698 So.2d 890, 891 (Fla. Dist. Ct. App. 1997) (citing *Motchkavitz v. L.C. Boggs Indus., Inc.,* 407 So.2d 910, 912 (Fla.1981)).  *Revoredo* further states: "[s]tatutory employees have been treated identically to actual employees in relation to standard employee exclusion clauses." 698 So.2d at 892 (citations omitted).[11]

The Fifth District Court of Appeal of Florida described its conceptualization of "subletting" in this context in its 1982 opinion, *Lingold v. Transamerica Insurance Co.*, in a footnote quoting *Jones v. Florida Power Corp.* (72 So.2d 285, 289 (Fla. 1954)): "[T]he effect of subletting is to pass on to another an obligation under a contract for which the person so 'subletting' is primarily

---

[11] Plaintiff has continually argued that the lack of mention of the words "statutory employee" in the text of the insurance policy must prevent the Court from finding that the policy allows for such an interpretation.  The Court disagrees with Plaintiff's interpretation of the law on this point.

obligated." *Lingold v. Transamerica Ins. Co.* 416 So.2d 1271, 1272, n.5 (Fla. Dist. Ct. App. 1982) (internal quotation marks omitted).

As to the statutory meaning of "contractor," *Motchkavitz* notes that "[t]he statute does not make the distinction [between independent and general contractors], but speaks only of 'contractors.' A contractor is one under a contractual obligation to perform some work for another." 407 So.2d at 914 (internal citations omitted).

*Reveredo* is careful to note that "[s]ection 440.10(1) does not make the statutory employer-employee relationship contingent on the securing of workers' compensation for the employee." 698 So.2d at 892. Instead, "it is the creation of the statutory employer-employee relationship that establishes the employer's duty to secure compensation." *Id.* The creation of that relationship takes place in "the act of subletting (subcontracting)." *Id.* (citing *Lingold v. Transamerica Ins. Co.*, 416 So.2d 1271, 1272-73 (Fla. Dist. Ct. App. 1982). The *Reveredo* court holds that "a failure to secure payment of compensation" does not disestablish that relationship. 698 So.2d at 892; *see also Mid-Continent Cas. Co. v. Constr. Servs. and Consultants, Inc.*, No. 06-cv-80922, 2008 WL 896221 at *6 (S.D. Fla. 2008) ("The Court also rejects any contention that the [policy] exclusions do not apply because of issues as to whether worker's compensation coverage was in fact in place and whether Juarez actually was able to collect under available worker's compensation coverage" (citing *Reveredo*). It is therefore immaterial to this analysis whether or not Plaintiff Stephens received worker's compensation on behalf of the decedent, a point of dispute among the parties. Instead, the question is one of relationships: Anchorage Homes' relationship to the Kirklands, Anchorage's relationship to Jack Fritz, and the decedent's relationship to Jack Fritz.

Based on this Court's finding that Becker was employed by Jack Fritz at the time of his death, we are left with the question of whether Anchorage shared a vertical or horizontal relationship with Jack Fritz with regards to the Kirklands. It is the Court's finding that Anchorage

did sublet a portion of its work to a sub-contractor, making the decedent a "statutory employee" of Anchorage Homes and triggering the exclusionary language of the insurance policy.

Under the general approach to duty to defend as called for by Florida law, the Court finds that the facts alleged in the underlying complaint show that the decedent was a statutory employee of Anchorage, triggering of the Employer's Liability exclusion in the insurance policy. Each of the Kirklands were separately alleged to be "contractor of record" for the project. (Stephens Am. Compl. ¶¶ 83, 99). However, while Anchorage "was hired to supply and install a modular home," (Amended Compl. ¶20), Jack Fritz was *also* "hired to install a modular home." (Stephens Am. Compl. ¶14). It is easily inferred, thus, that Anchorage sublet part of its duties to Jack Fritz. In addition, despite Plaintiff's attempts throughout this case to paint the Kirklands as the general and only contractor on the project, with all other companies as co-subcontractors, the underlying complaint refers to each Kirkland's failure to recognize the likelihood that a "worker" would be injured, while replacing the word "worker" with "employee" in otherwise identical allegations against both Fritz and Anchorage. (Stephens Am. Compl. ¶¶ 67, 83, 99, 115.) If Anchorage and Fritz were both equal co-subcontractors under the Kirklands, then Fritz's employee would logically not be Anchorage's employee. If Anchorage sublet some of its duties to another company, then an employee of the other company would be, under the Florida law set forth above, a statutory employee of Anchorage. Under the Employer's Liability exception in the policy, there would not be insurance coverage for the death of such an employee.

It may perhaps seem abrupt to base the fate of this case on merely the use of the words "install," "worker," and "employee" in a complaint. But there is a vast array of extrinsic evidence in the record supporting a lack of coverage as well. Recognizing the Eleventh Circuit's hesitancy to consider such extrinsic evidence, this Court nonetheless views the extrinsic evidence in this case as too weighty to ignore. First, there is the matter of Anchorage's Owner/Contractor Agreement with

19

the Kirklands. Starting with the letterhead and document title, the agreement is unassailable evidence that Anchorage was a General Contractor, or at least acting above Fritz in a vertical contracting chain. The agreement allowed for Anchorage to engage subcontractors, and set up a system for the owners to pay any subcontractors through Anchorage. As noted in the facts above, this describes to a T the nature of Anchorage's interactions with Fritz: Fritz submitted estimates to Anchorage, and Anchorage paid Fritz from the progress payments issued by the Kirklands. In fact, one of the progress payments to Anchorage listed in the Owner/Contractor Agreement is earmarked for *setting* the home, and Fritz was indisputably hired to *set* the home on the foundation. This is a clear sublet of Anchorage's duties to Fritz.

Plaintiff argues that this agreement does not fairly represent the true nature of the relationship between the Kirklands and Anchorage, and that the agreement represented a boilerplate form habitually used by Anchorage. (Pl.'s Opp. To Def.'s Mot. for Final Summ. J. 6, DE #129.) However, as Defendant has repeatedly argued, Plaintiff is asking the Court to incorporate parol evidence in its consideration of an unambiguous contract. The Court must contain its interpretation of this contract within the four corners of the document, and such an interpretation is quite telling.

In addition, Anchorage Homes and others appear to have held Anchorage out as the General Contractor on the project. Liptak, the Principal for Anchorage, signed some of the versions of the building permit in the record as well as other documents submitted on behalf of the project to the county. Liptak also signed and filed the site plan regarding the sewage disposal system, signing his name alongside the handwritten letters "GC." Although some documents listed the owners as contractors, it is clear to the Court that Anchorage Homes was acting in a capacity beyond merely co-subcontractor. There is also the February 27, 2009 demand letter, which refers multiple times to Fritz as Anchorage's hired subcontractor and refers to Anchorage as the general contractor.

Finally, there is the nature of the relationship between Anchorage and Fritz. As described

above, Anchorage paid Fritz, rather than the Kirklands paying Fritz directly.  In addition, Fritz submitted estimates to Anchorage, rather than to the Kirklands directly.  Although Fritz may have never entered a contract with Anchorage, Fritz clearly worked through Anchorage.  As Fritz's estimates stated, he was to bill Anchorage but ship to the Kirklands.

## IV.    Conclusion

Whether Anchorage was the General Contractor of the project or just the contractor above Fritz, Fritz was Anchorage's subcontractor and Fritz's employee was Anchorage's statutory employee.  The extrinsic evidence in this case supports a finding that there was no coverage for Becker's death pursuant to the Employer's Liability exclusion of the insurance policy.  Therefore, the Court finds that Mid-Continent did not have a duty to defend and did not wrongfully refuse to defend. As the duty to defend question has been addressed by a finding of a lack of coverage, it is unnecessary to reach the duty to indemnify or whether the settlement agreement was reasonable and reached in good faith.

After careful consideration and based on the foregoing opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that summary judgment in favor of Mid-Continent Casualty Company be, and the same is hereby, **GRANTED**.

**DONE and ORDERED** in chambers at the James Lawrence King Federal Justice Building and United States Courthouse, Miami, Florida, dated this 7th day of January, 2013.

JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF FLORIDA

cc: All Counsel of Record

21